**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS.   A-1796-22
                          A-1797-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

ALTERIK ELLIS, a/k/a
ALTERIK TERRELL ELLIS,
ALTERIK REEK, and
LATERIK REEK,

     Defendant-Appellant.

_____

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

TRAVIS DEFOE, a/k/a
ALAN WILSON and
MESIAH BLACKWELL,

     Defendant-Appellant.

_____

Argued (A-1796-22) and Submitted (A-1797-22)

October 7, 2025 – Decided October 23, 2025

Before Judges Firko, Perez Friscia and Vinci.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 19-01-0118.

Stephen W. Kirsch, Designated Counsel, argued the cause for appellant Alterik Ellis in A-1796-22 (Jennifer N. Sellitti, Public Defender, attorney; Stephen W. Kirsch, on the brief).

Jennifer N. Sellitti, Public Defender, attorney for appellant Travis Defoe in A-1797-22 (Amira R. Scurato, Designated Counsel, on the brief).

Patrick F. Galdieri, II, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent State of New Jersey (Wayne Mello, Acting Hudson County Prosecutor, attorney; Patrick F. Galdieri, II, of counsel and on the briefs).

PER CURIAM

In these back-to-back appeals, which we have consolidated for the purpose of writing one opinion, defendants Alterik Ellis and Travis Defoe challenge their convictions and sentences for murder, conspiracy to commit murder, aggravated assault, and theft. Each defendant was sentenced to an aggregate term of thirty-five years' imprisonment. Because the court erred in instructing the jury on accomplice liability, we reverse defendants' convictions and remand for a new trial or further proceedings.

I.

A Hudson County grand jury returned a sixteen count indictment, number 19-01-0118, charging Ellis with the following offenses: first-degree murder, N.J.S.A. 2C:11-3(a)(1) or (2) (count one); first-degree conspiracy to commit murder, N.J.S.A. 2C:5-2(a)(1) (count two); three counts of second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1) (counts three through five); second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1) (count six); second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1) (count seven); and third-degree theft, N.J.S.A. 2C:20-3(a) (count eight).

Defoe was charged in the same sixteen-count indictment in counts nine through sixteen with the same offenses as Ellis: first-degree murder (count nine); first-degree conspiracy to commit murder (count ten); three counts of second-degree aggravated assault (counts eleven, twelve, and thirteen); second-degree possession of a firearm for an unlawful purpose (count fourteen); second-degree unlawful possession of a handgun (count fifteen); and third-degree theft (count sixteen).

Defendants were tried together over the course of eleven days. At the close of the State's case, Ellis moved for a judgment of acquittal on all eight

counts against him. The court granted the motion as to counts three, four, five, and seven, but denied the motion as to counts one, two, six, and eight.

Defoe also moved for a judgment of acquittal on all eight counts against him. The court granted the motion as to counts eleven, twelve, thirteen, and fifteen, but denied the motion as to counts nine, ten, fourteen, and sixteen.

The jury found Ellis guilty on counts one, two, six, and eight, and Defoe guilty on counts nine, ten, fourteen, and sixteen. Defendants moved for a new trial and a judgment notwithstanding the verdict. The court denied both motions.

At Ellis's sentencing, the court imposed a thirty-five-year term with a thirty-year parole disqualifier on count one; a twenty-year term, with an eighty-five percent period of parole ineligibility under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, on count two; a seven-year term with a three-year parole disqualifier on count six; and a four-year term on count eight. The sentences on counts two, six, and eight were all concurrent to the sentence imposed on count one.

At Defoe's sentencing, the court imposed a thirty-five-year term with a thirty-year parole disqualifier on count nine; a twenty-year term with an eighty-five percent period of parole ineligibility under NERA on count ten; a seven-year term with a three-year parole disqualifier on count fourteen; and a four-

A-1796-22

year term on count sixteen.  The sentences on counts ten, fourteen, and sixteen were all concurrent to the sentence imposed on count nine.  The court issued judgments of conviction (JOC).  Defoe's JOC was amended to reflect his proper jail credits.  These two appeals followed.

On appeal, Ellis raises the following contentions:

POINT I

THE MOTION FOR A JUDGMENT OF ACQUITTAL ON THE HOMICIDE, CONSPIRACY, AND UNLAWFUL-PURPOSE WEAPONS COUNTS SHOULD HAVE BEEN GRANTED BECAUSE THERE WAS INSUFFICIENT EVIDENCE IN THE STATE'S CASE TO PROVE THOSE CHARGES UNDER STATE V. REYES[1] AND STATE V. LODZINSKI.[2]

POINT II

DESPITE THE FACT THAT THERE WAS NO FINGERPRINT EVIDENCE BEFORE THE JURY THAT LINKED DEFENDANT OR THE CO[-]DEFENDANT TO THE TOYOTA CAMRY THAT THE STATE CLAIMED WAS THE VEHICLE IN WHICH THE SHOOTER AND HIS ACCOMPLICE DROVE TO AND FROM THE SCENE, THE JUDGE IMPROPERLY PREVENTED DEFENSE COUNSEL FROM ARGUING THAT FACT TO THE JURY IN SUMMATION.

---

[1] 50 N.J. 454 (1967).

[2] 467 N.J. Super. 447 (App. Div. 2019) (Lodzinski I); 246 N.J. 331 (2021) (Lodzinski II); and 249 N.J. 116 (2021) (Lodzinski III).

POINT III

THE PROSECUTOR STEPPED FAR OUTSIDE THE BOUNDS OF PROPRIETY WHEN HE BADLY MISSTATED THE TESTIMONY OF THE ONLY EYEWITNESS IN THE CASE, OVER THE OBJECTION OF DEFENSE COUNSEL.

POINT IV

THE TRIAL JUDGE IMPROPERLY BARRED THE DEFENSE FROM QUESTIONING A LAW ENFORCEMENT WITNESS ABOUT HIS PENDING INVESTIGATION FOR MISCONDUCT ON THE JOB, DESPITE THE FACT THAT THE PENDING INVESTIGATION MIGHT AFFECT THE JURY'S EVALUATION OF HIS BIAS AND CREDIBILITY AS A WITNESS.

POINT V

DESPITE HAVING PROVIDED THE JURY WITH INSTRUCTIONS ON LESSER-INCLUDED HOMICIDE OFFENSES, THE JUDGE'S INSTRUCTIONS ON ACCOMPLICE LIABILITY FAILED TO CONVEY THE CRITICAL PRINCPLE, FROM STATE V. BIELKIEWICZ,[3] THAT AN ACCOMPLICE AND A PRINCIPAL CAN BE GUILTY OF DIFFERENT HOMICIDE OFFENSES DEPENDING ON THEIR INDIVIDUAL STATES OF MIND; IN FACT, THOSE INSTRUCTIONS FAILED TO TELL THE JURY AT ALL THAT THE CONCEPT OF ACCOMPLICE LIABILITY APPLIED TO ANY HOMICIDE OFFENSE OTHER THAN MURDER. (NOT RAISED BELOW)

---

[3] 267 N.J. Super. 520 (App. Div. 1993).

A-1796-22

POINT VI

THE JURY INSTRUCTIONS ON CONSPIRACY TO COMMIT MURDER FAILED TO RESTRICT THOSE CONSPIRACIES TO AGREEMENTS TO PURPOSELY KILL, INSTEAD EXPANDING THE DEFINITION OF THE CRIME TOO FAR TO INCLUDE AGREEMENTS TO KNOWINGLY KILL OR TO PURPOSELY OR KNOWINGLY SERIOUSLY INJURE SOMEONE. (NOT RAISED BELOW)

POINT VII

DEFENDANT'S CONVICTIONS SHOULD BE REVERSED FOR CUMULATIVE ERROR. (NOT RAISED BELOW)

POINT VIII

DEFENDANT'S CONVICTIONS FOR CONSPIRACY AND POSSESSION OF A WEAPON FOR AN UNLAWFUL PURPOSE SHOULD HAVE BEEN MERGED INTO HIS MURDER CONVICTION. (NOT RAISED BELOW)

Defoe raises the following contentions:

POINT I

DEFENDANT WAS DENIED HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL BY THE JUDGE'S FAILURE TO ENSURE THAT THE JURY VERDICT MET THE EVIDENTIAL STANDARD MANDATED BY OUR CONSTITUTIONAL JURISPRUDENCE AND COURT RULES. U.S. CONST. AMENDS. V AND XIV, N.J. CONST. ART. I, [¶ ¶] 1, 9, AND 10.

A-1796-22

POINT II

DEFENDANT WAS DENIED HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL BY A FAULTY ACCOMPLICE LIABILITY JURY CHARGE THAT FAILED TO PROPERLY INSTRUCT THE JURY THAT DEFENDANT COULD BE LIABLE FOR A LESSER OFFENSE THAN THE PRINCIPAL. U.S. CONST. AMENDS. V and XIV, N.J. CONST. ART. I, [¶ ¶] 1, 9, AND 10. (NOT RAISED BELOW)

POINT III

DEFENDANT WAS DENIED HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL BY A FAULTY CONSPIRACY JURY CHARGE AS TO MURDER. (NOT RAISED BELOW)

POINT IV

DEFENDANT WAS DENIED HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL WHEN THE JUDGE REFUSED DISCOVERY REQUESTS AND REFUSED TO ALLOW CROSS-EXAMINATION OF POLICE WITNESSES AS TO THE FBI'S INVESTIGATIONS INTO THEIR MISCONDUCT.

POINT V

DEFENDANT WAS DENIED HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL WHEN THE ASSISTANT PROSECUTOR MISSTATED THE SOLE LAY WITNESS'[S] TESTIMONY IN HIS SUMMATION.

POINT VI

DEFENDANT WAS DENIED HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL WHEN THE TRIAL COURT REFUSED TO ALLOW DEFENSE COUNSEL TO ARGUE IN SUMMATION FAIR COMMENT THAT THE STATE HAD FAILED TO CARRY ITS BURDEN OF PROVING THE OFFENSES BEYOND A REASONABLE DOUBT BECAUSE IT FAILED TO PRODUCE ANY EVIDENCE CONNECTING DEFENDANTS TO THE [TWENTY-SIX] FINGERPRINTS FOUND IN THE CAR.

POINT VII

THE TRIAL JUDGE ERRED IN FAILING TO MERGE CONSPIRACY AND POSSESSION OF A WEAPON FOR AN UNLAWFUL PURPOSE INTO THE MURDER CONVICTION. (NOT RAISED BELOW)

POINT VIII

DEFENDANT'S CONVICTIONS SHOULD BE REVERSED FOR CUMULATIVE ERROR.

II.

These cases stem from the death of seventeen-year-old J.S.,[4] who died as a result of a drive-by shooting in Jersey City. Detective Michael Burgess of the Jersey City Police Department (JCPD) testified that on October 26, 2018, at

---

[4] We use initials to protect the identities of the victims. N.J.S.A. 2A:82-46(d).

approximately 11:30 p.m., he was dispatched to a report of gunshots fired at 76 Brinkerhoff Street. J.S.'s "lifeless" body was lying in a pool of blood "right behind the front door" of the apartment building located at 76 Brinkerhoff Street.

When he arrived at the scene, Burgess was directed to a "dark colored" car parked on the north side of Brinkerhoff Street, which had been detained with four occupants: Jayden Boyd, Addison Bansraj, Dionte Spell, and Lomell Farmer. According to Burgess, the four individuals were "patted down for weapons" and temporarily secured. Burgess did not note the make or model of the dark colored car, and the police radio recordings of that night were not preserved. A second victim, S.W., who had been in apartment one at 76 Brinkerhoff, was taken from the scene by ambulance.

Detective Scott Rogers of the JCPD testified he responded to the scene and when he arrived, there were already police officers at the scene, including: Officer Melange Ramirez, Officer Yabir Singh, Officer Wiggins, Officer Robertson, Lieutenant Timmins,[5] and Burgess. He noticed that there was a "small crowd in front at 76 Brinkerhoff," and J.S.'s body was inside the vestibule

---

[5] The record does not contain the first names for Wiggins, Robertson, and Timmins.

"on her side" with her feet toward the exit door and her head toward the interior of the vestibule.

Rogers testified that he spoke to, among others, four females who were at the scene: Keshana West, Zakeda Holmes, Sierra Wright, and Yasmia Johnson. He obtained their contact information before they were transported to the "West District." Rogers also spoke with S.W. (the alleged victim in counts four and twelve) and Gregory Lampkin, but he did not obtain their contact information.

Detective Daniel Bellini of the Hudson County Prosecutor's Office (HCPO) testified that in October 2018, he was assigned to the Crime Scene Unit. At approximately 11:50 p.m., he was called and told by Detective Matthew Kickey, also of HCPO's Crime Scene Unit, "that there was a female who was shot and eventually pronounced deceased." He had arrived at the scene together with Detective Maegan Larsen, also of the HCPO Crime Scene Unit, at approximately 12:55 a.m. He explained that "[i]t was raining heavily," and it was windy, cold, and "the lighting issues were poor."

Upon arrival Bellini observed several shell casings in the roadway of Brinkerhoff Street. He testified that nine-millimeter shell casings were recovered from the street outside 76 Brinkerhoff, one projectile from the vestibule, and one projectile fragment. Bellini noted that multiple "apparent

projectile defect[s]" were found on the building and on the stairs leading up to the building. He testified that the recovered spent casings had "the head stamp PMC .9-millimeter Luger." No gun was recovered, but the police found a black T-Mobile cell phone and a white Apple iPhone at the scene. Bellini also observed J.S.'s body in the entryway vestibule. According to Bellini, "[J.S.] was laying on the ground on her side in the fetal position."

Bellini stated that a cigarette butt was found near one of the shell casings, but it was not seized. Bellini also testified that the police did not insert a "protrusion rod" into any of the bullet holes or projectile defects to determine the trajectory of the gunfire.

On cross-examination, defense counsel asked Bellini if he was "currently under investigation by the [FBI]." The State objected and, at sidebar, explained that Bellini was under investigation in an unrelated matter. Defense counsel argued that the inquiry was relevant because Bellini was "under investigation relating to his ability to handle and properly store evidence, which goes to the heart of his role in this case." Defense counsel argued that the inquiry related to Bellini's credibility, bias, and motive, claiming that Bellini, who had already been "demoted," had "every incentive in this case to testify exactly how the State wants him [to], whether or not it is, in fact, the truth in this case."

12

Still at sidebar, the State argued that the line of questioning was improper because it involved an ongoing investigation with no finding of wrongdoing. Further, the State argued that Bellini was entitled to the presumption of innocence, and "under the law a witness' credibility may only be impeached by specific instances of sustained finding of misconduct." The court, after confirming that the investigation had nothing to do with defendants' case, stated that the defense did not provide it with anything to justify the proposed line of questioning, sustained the State's objection, and told the jury to disregard the question.

Jovette Brown, supervisor of the JCPD's CCTV[6] Unit, testified about the system of civilian cameras in various Jersey City locations. As supervisor, she monitored the CCTV cameras throughout the city and handled requests for footage from the police, the prosecutor's office, and civilians. She explained that there are more than two hundred cameras in various locations throughout Jersey City, divided into North, West, East, and South districts. The cameras record twenty-four hours a day, seven days a week, and the CCTV system was in good working order in October 2018.

---

[6] CCTV stands for "closed caption television."

Detective Risheem Whitten of the HCPO testified that in October 2018, he was a member of the Crime Scene Unit (CSU). As part of his investigation into J.S.'s shooting, Whitten processed a 1999 white Toyota Camry, bearing New Jersey license plate number Y75 JZT, for evidence. Whitten stated that twenty-six fingerprints were lifted from the inside, the outside, and from items within the Camry. Ten of the twenty-six prints were taken from the passenger's side of the vehicle, including the door handle. He clarified that none of the fingerprints were lifted from the gearshift lever, and the lever was not swabbed for DNA.

Whitten also testified that he recovered "a burnt marijuana roach" from the Camry. Whitten stated that he did not process a cigar wrapper found in the Camry, and that no firearm or ammunition was recovered from the vehicle.

Detective Anthony Espaillat of the HCPO testified that in October 2018, he was assigned to the CSU. As part of the investigation, Espaillat met with the registered owner of the Camry, Son Doan, and took comparison fingerprints, palm prints, and a buccal swab from Doan.

On July 7, 2022, the State moved for a mistrial based on defense counsel's questioning of Bellini, specifically, whether he was under investigation by the FBI. In denying the State's motion for a mistrial, the court held:

14

There was an objection at the time, it was sustained. The jury was told . . . to disregard the question. And there was no response to the question.

[The court] presume[s] a tactical decision was made not to ask the [c]ourt for any further instruction at the time. It [was not] an appropriate question, bad form, but [the court does not] think a mistrial is warranted. [The] matter is somewhat distinguishable from [Arizona v. Washington, 434 U.S. 497 (1978),] . . . . This was asked in conjunction with a number of other questions on . . . cross. It was a somewhat fleeting moment that was corrected to the extent possible.

The . . . [c]ourt will consider any curative instruction that the State might want it to give the jury at the end of this case, but [the court does] not believe, under the circumstances, a mistrial is warranted.

Doan testified with the aid of a Vietnamese interpreter. In September through October 2018, Doan stated he owned a 1999 Toyota Camry, the same vehicle that Tacora Gordon had identified as one of the two white cars on Brinkerhoff Street at the time of the shooting. In September 2018, Doan's Camry went missing and he reported it stolen. Doan explained that he left his Camry in a restaurant parking lot, he went into the restaurant to pick up food, and then when he returned ten to fifteen minutes later, the car was gone.

On October 30, 2018, Doan met with HCPO detectives, and his Camry was returned to him. Doan testified that he did not recall if he left the keys in the car, but it was later stipulated that he had. Doan also testified that most of

15

the items found in the car belonged to him, but said that although he was a smoker, he never used the ashtray in the car.

Dr. Gregory Conti, assistant medical examiner at the Northern Regional Medical Examiner's Office, was qualified as an expert in the field of forensic pathology and testified for the State. Dr. Conti testified J.S.'s cause of death was a gunshot wound to the head and determined that the manner of death was homicide. He explained that a projectile entered the left side of J.S.'s head, "slightly above the ear within the scalp hair," and exited the right side of the head "between the ear and the cheek." The direction of the projectile was "left to right and downwards."

Tamika Ginn, a forensic scientist employed by the New Jersey State Police Office of Forensic Science, was qualified as an expert in the field of forensic serology and testified for the State. Ginn explained that she received items in connection with the investigation into the shooting death of J.S. for analysis; specifically, a steering wheel cover and "a marijuana roach." Ginn "swabbed each item for potential skin cells," and submitted the swabbings to the DNA laboratory for further analysis.

Christopher Szymkowiak, a forensic DNA analyst employed by the New Jersey State Police Office of Forensic Science, was qualified as an expert in the

16

field of DNA analysis and testified for the State. Szymkowiak compared the DNA recovered from the steering wheel cover and the marijuana roach to the reference sample from Doan, the Camry's owner, and reference samples from defendants. The sample taken from the steering wheel cover was "not suitable for comparisons." Szymkowiak's analysis excluded both defendants as possible matches for the DNA recovered from the marijuana roach.

Detective John Mikhail of the HCPO testified that he showed Gordon a video of CCTV footage, which depicted the area of Monticello Avenue and Brinkerhoff Street at 11:33 p.m. Gordon was also shown still photos from the footage.

Detective Matthew Svorinic, of the HCPO Technical Assistance Response Unit, testified that he obtained eighteen surveillance videos from various private and commercially owned cameras that were along the route travelled by a white car. Out of the eighteen videos, seven had accurate time stamps. Svorinic explained that he determined whether the DVR's time stamps were fast or slow by using a phone application.

Detective Paul Grosso of the HCPO Technical Assistance Response Unit testified that he also retrieved some surveillance videos. Grosso also testified

A-1796-22

there were time discrepancies in some of the videos. Detective John Skolnick of the HCPO Technical Services Unit also retrieved some surveillance videos.

Detective Emiliano Fuda of the Port Authority Police retrieved PATH train videos from Newark Penn Station and Journal Square.

Guershon Cherilien of the HCPO testified that on November 5, 2018, he conducted a search of 16-20 Lexington Avenue, apartment 4C, in Jersey City, where Ellis resided. Cherilien seized a dark hooded polo jacket with a zipper. On cross-examination, Cherilien testified that no guns or drugs were seized from Ellis's residence.

Gordon was called as a State's witness. Gordon testified that she resided on the second floor of the three-story building at 76 Brinkerhoff. However, on the night of the incident, Gordon was on the third floor, and her brother Asmar Gordon was on the porch. When asked whether her brother was with anyone, she responded, "I heard noise. It was females, it was males, yes. He was outside with people."

Gordon testified that she heard gunfire shortly after 11:30 p.m. and thought she heard more than five gunshots. After hearing the gunfire, she ran to the third-floor window where she saw three vehicles: two white cars and one black car. Gordon testified that she did not remember "exactly," but she saw

18

"two white cars," and saw "someone hanging mid waist" from the window of one of the white cars and shooting.

Gordon acknowledged giving a statement to the HCPO within a few days of the incident. She was shown a picture of a white Camry and testified it was "the white car that I [saw] on the block that day," but was not sure if it was the car she saw the individual hanging out of while shooting, because she had seen two white cars on the street that day. She explained, "I [am] not sure whether it was the . . . white Pontiac or the white [Camry] that you guys actually showed me."

Gordon also testified that she saw one of the white cars drive towards Bergen Avenue. When Gordon was provided with a copy of her statement to the HCPO to refresh her recollection, she testified she told the HCPO that the white car went toward Bergen: "Yes. I said towards Bergen. You go straight, it turns into another block, which is Bentley."

Detective Michael Giannini of the HCPO Homicide Unit testified that he was involved in the investigation into the shooting death of J.S. As part of the investigation, he met with Defoe on November 1, 2018. Giannini identified Defoe's arrest photograph, which had been taken that same day, and explained that based on his observations of Defoe, it fairly and accurately depicted his

19

appearance. Giannini testified that at the time of Defoe's arrest on November 1, 2018, Defoe was wearing gray sweatpants and black, gray, and yellow Air Max sneakers.

Giannini also testified that as part of his investigation, he had an opportunity to observe Ellis on November 5, 2018. Giannini identified a photograph of Ellis taken that day, which fairly and accurately depicted his appearance.

During his summation, the prosecutor played some of the surveillance videos for the jury, while narrating what he believed the videos depicted. The prosecutor explained that at 11:19 p.m., two men, whom he identified as Ellis and Defoe, were seen in a video from the Bergen and Lexington apartments "walking together." The prosecutor described defendants as "virtually in lockstep with one another walking down the street, eventually to go get the car." The prosecutor submitted that the video demonstrated that defendants were "together" and "walking with purpose," which was "evidence of a plan, evidence of a conspiracy."

At 11:22 p.m., defendants are seen on the video on the opposite side of the street at 110 Oak. According to the prosecutor, defendants were "almost parallel to each other on the street," walking "at the same pace." The prosecutor

A-1796-22

stated defendants "almost turn around at the same time" and get into the white Camry, with Ellis in the front passenger seat.  The prosecutor stated, "[t]hey [do not] pull off right away," rather, "[t]hey stay there for a little while longer, another few minutes, and essentially, again, nobody is around, time to go."

At 11:32 p.m., in a video from 75 Harrison, the Camry is seen making a turn, and then in a CCTV video from Monticello and Brinkerhoff, the Camry is seen making a left turn onto Brinkerhoff.  A video from 38 Bentley showed that at approximately 11:34 p.m., which the State contends is after the shooting, Ellis exited the Camry.  At 11:37 p.m., in a video from 2380 Kennedy Boulevard, Ellis is seen at a 7-Eleven convenience store.  At 11:39 p.m., "two minutes after he's seen at the 7-[E]leven," Ellis is seen on video from the first-floor hallway of his apartment building at 16-20 Lexington, wearing what appeared to be the same hooded sweatshirt that police later seized from his apartment.

According to the prosecutor, Ellis is seen "[e]xtending his hand as if mimicking gunshots."  At 11:44 p.m., video from the same building showed Ellis "walking towards [his] fourth-floor apartment."  Ellis then entered his apartment, "he stay[ed] there a few minutes," then he c[ame] out wearing "an entirely different outfit."

21

The prosecutor explained Defoe is seen on a video from 39 Fleming Avenue in Newark, making a turn in the Camry at 11:46 p.m. and then walking in that area at 11:52 p.m. Later, Defoe is seen in a video at Penn Station in Newark, and according to the prosecutor "he g[ot] on a train" and is later seen at the Journal Square station in Jersey City.

Defendants did not call any witnesses at trial to testify.

## III.

### The Jury Instructions

"Appropriate and proper jury instructions are essential for a fair trial." State v. A.L.A., 251 N.J. 580, 591 (2022). A jury charge must "correctly state the applicable law, outline the jury's function and be clear in how the jury should apply the legal principles charged to the facts of the case at hand." Ibid. (quoting Est. of Kotsovska v. Liebman, 221 N.J. 568, 591 (2015)). Moreover, jury charges should be tailored to the specific facts of the case. See State v. Savage, 172 N.J. 374, 389 (2002) (noting that New Jersey courts "regularly have noted the importance of tailoring the jury charge to the facts of the case").

Appellate courts "review for plain error the trial court's obligation to sua sponte deliver a jury instruction when a defendant does not request it and fails to object at trial to its omission." State v. Alexander, 233 N.J. 132, 141-42

22

(2018) (citing State v. Cole, 229 N.J. 430, 455 (2017)). "To warrant reversal, the unchallenged error must have been 'clearly capable of producing an unjust result.'" Id. at 142 (quoting R. 2:10-2). "The mere possibility of an unjust result is not enough." State v. Funderburg, 225 N.J. 66, 79 (2016). Instead, "[t]he possibility must be real, one sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." Alexander, 233 N.J. at 142 (alteration in original) (quoting State v. Macon, 57 N.J. 325, 336 (1971)).

## The Accomplice Liability Charge

For the first time on appeal, Ellis and Defoe in Points V and II of their merits briefs contend the court erred in instructing the jury on accomplice liability. Ellis argues the court's instructions "failed to convey the critical principle [in] Bielkiewicz, that an accomplice and a principal can be guilty of different homicide offenses depending on their individual states of mind." Ellis points out the jury instructions "failed to tell the jury at all that the concept of accomplice liability applied to any homicide offense other than murder." Because the accomplice liability instruction was deficient in failing to convey the Bielkiewicz concepts regarding how accomplice liability is affected by

multiple defendants and lesser-included offenses, Ellis claims he was deprived of due process and a fair trial.

Defoe argues the accomplice liability instruction "was woefully inadequate" because it failed to properly advise the jury that he could be found guilty of a lesser offense than the principal. Defoe further asserts that the court used an incorrect Model Jury Charge, and additionally, incorrectly read the charge it provided. In particular, Defoe contends the accomplice liability charge was improper because it erroneously instructed the jury that the State was required to prove "Alterik Ellis and/or Travis Defoe possessed a criminal state of mind that is required to be proved against each other." Instead, Defoe argues a correct accomplice liability charge would instruct the jury to find Defoe guilty, if he "possessed the criminal state of mind that is required to be proved against the person who actually committed the criminal act."

According to Defoe, "because the State's entire case turned on accomplice liability, and there was a complete paucity of evidence" on Defoe's specific involvement, there can be no doubt that he was denied due process and a fair trial by the inadequate charge, warranting reversal of his convictions.

New Jersey courts "have always placed an extraordinarily high value on the importance of appropriate and proper jury charges to the right to trial by

jury."  State v. Grunow, 102 N.J. 133, 148 (1986).  "Erroneous instructions on matters or issues material to the jurors' deliberations are presumed to be reversible error."  Ibid. (citing State v. Collier, 90 N.J. 117, 122-23 (1982)).

"An essential ingredient of a fair trial is that a jury receive adequate and understandable instructions."   State v. Afanador, 151 N.J. 41, 54 (1997). "Correct jury instructions are 'at the heart of the proper execution of the jury function in a criminal trial.'"  Ibid. (quoting State v. Alexander, 136 N.J. 563, 571 (1994)).  The court must explain the law as it relates to the facts and issues of the case.  See State v. Baum, 224 N.J. 147, 159 (2016).

Erroneous jury instructions on "material" aspects are assumed to "possess the capacity to unfairly prejudice the defendant."  Ibid. (quoting State v. Bunch, 180 N.J. 534, 541-42 (2004)).  Incorrect instructions are "poor candidates for rehabilitation under a harmless-error analysis," State v. Rhett, 127 N.J. 3, 7 (1992), and are "excusable only if they are harmless beyond a reasonable doubt." State v. Vick, 117 N.J. 288, 292 (1989) (quoting State v. Crisantos, 102 N.J. 265, 273 (1986)).  "As an indication of the paramount importance of accurate jury instructions, we have held that erroneous instructions on material issues are presumed to be reversible error."  State v. Marshall, 173 N.J. 343, 359 (2002).

A-1796-22

"It is the independent duty of the court to ensure that the jurors receive accurate instructions on the law as it pertains to the facts and issues of each case, irrespective of the particular language suggested by either party." State v. Reddish, 181 N.J. 553, 613 (2004). "The charge as a whole must be accurate." State v. Singleton, 211 N.J. 157, 182 (2012). However, "[n]o party is entitled to have the jury charged in his or her own words; all that is necessary is that the charge as a whole be accurate." State v. Jordan, 147 N.J. 409, 422 (1997).

A reviewing court must evaluate the jury charge in its entirety to determine its overall effect. See Savage, 172 N.J. at 387. A person is guilty of the offense as an accomplice if he, or she, "[w]ith the purpose of promoting or facilitating" the commission of the offense: "(a) [s]olicits such other person to commit it; (b) [a]ids or agrees or attempts to aid such other person in planning or committing it; or (c) [h]aving a legal duty to prevent the commission of the offense, fails to make proper effort so to do." N.J.S.A. 2C:2-6(c)(1)(a-c). "When a prosecution is based on the theory that a defendant acted as an accomplice, the trial court is required to provide the jury with understandable instructions regarding accomplice liability." Savage, 172 N.J. at 388.

Accordingly, "a jury must be instructed that to find a defendant guilty of a crime under a theory of accomplice liability, it must find that he [or she]

26

'shared in the intent, which is the crime's basic element, and at least indirectly participated in the commission of the criminal act.'" Bielkiewicz, 267 N.J. Super. at 528 (quoting State v. Fair, 45 N.J. 77, 95 (1965)); see also State v. Whitaker, 200 N.J. 444, 458 (2009) ("Whether a defendant is a principal or an accomplice, the State must prove that he [or she] possessed the mental state necessary to commit the offense.") (citing N.J.S.A. 2C:2-2(a)), State v. Weeks, 107 N.J. 396, 403 (1987) (finding that in order to convict a defendant as an accomplice, "[the jury] had to find that the defendant had the purpose to participate in the crime defined in the Code").

It is an "indisputable notion" that "a principal and an accomplice, although perhaps liable for the same guilty act, may have acted with different or lesser mental states, thus giving rise to different levels of criminal liability." State v. Ingram, 196 N.J. 23, 41 (2008). Thus, "when an alleged accomplice is charged with a different degree offense than the principal or lesser included offenses are submitted to the jury, the court has an obligation to 'carefully impart[] to the jury the distinctions between the specific intent required for the grades of the offense.'" Bielkiewicz, 267 N.J. Super. at 528 (alteration in original) (quoting Weeks, 107 N.J. at 410).

A-1796-22

However, "the obligation to provide the jury with instructions regarding accomplice liability arises only in situations where the evidence will support a conviction based on the theory that a defendant acted as an accomplice." State v. Crumb, 307 N.J. Super. 204, 221 (App. Div. 1997) (citing Bielkiewicz, 267 N.J. Super. at 527). "When the State's theory of the case only accuses the defendant of being a principal, and a defendant argues that he [or she] was not involved in the crime at all, then the judge is not obligated to instruct on accomplice liability." State v. Maloney, 216 N.J. 91, 106 (2013); see also State v. Rue, 296 N.J. Super. 108, 115 (App. Div. 1996) (finding accomplice liability charge not warranted where prosecution was based on "defendant's culpability . . . as a principal" for one defendant and the other defendant "was not guilty of a crime at all").

In this case, during the charge conference, both defendants argued that the "mere presence" portion of the accomplice liability charge should be provided to the jury, not the entire charge, because the State did not proceed on an accomplice liability theory. Nonetheless, the court instructed the jury in accordance with the Model Jury Charge on accomplice liability, which applies when a defendant is charged as an accomplice, and the jury does not receive instruction on lesser-included charges. See Model Jury Charges (Criminal),

"Liability for Another's Conduct" (N.J.S.A. 2C:2-6), "Accomplice, Charge # One" (rev. June 7, 2021) [hereinafter, Model Charge # One]. Neither defendant objected to this version of the accomplice liability charge at the charge conference or at trial.

Before us, defendants argue that the court should have provided the jury with Model Jury Charges (Criminal), "Liability for Another's Conduct" (N.J.S.A. 2C:2-6), Accomplice, Charge # Two (rev. June 7, 2021) [hereinafter, Model Charge # Two].[7] Specifically, Ellis argues that the court improperly omitted the following language: "[r]emember that this defendant can be held to be an accomplice with equal responsibility only if you find as a fact that he/she possessed the criminal state of mind that is required to be proved against the person who actually committed the criminal act(s)." Model Charge # Two, at 3.[8] Ellis also argues that the court improperly omitted the following language:

> [o]ur law recognizes that two or more persons may participate in the commission of an offense but each may participate therein with a different state of mind.

---

[7] This Model Jury Charge is used where a "defendant is charged as accomplice and the jury is instructed as to lesser included charges," and "is intended to address circumstances similar to those in [Bielkiewicz, 267 N.J. Super. at 533]." Model Charge #2, at 1, n.1.

[8] This language is not part of Model Charge # One.

> The liability or responsibility of each participant for any ensuing offense is dependent on his/her own state of mind and not on anyone else's.
>
> [Model Charge # Two, at 5.[9]]

Ellis argues that the foregoing language and concepts "are so important in the context of lesser-included offenses, for it is those concepts that allow a jury to convict an accomplice of a less-serious homicide offense than the principal," and that the court's instruction to the jury "omitted those concepts entirely." Ellis maintains "the instant instruction said nothing at all about accomplice liability even applying to lesser-included offenses, let alone spelling out that principals and accomplices are to be judged on their own state of mind, not someone else's and that accomplices can be guilty of less-serious crimes than principals depending on their individual states of mind."

In a similar vein, Defoe maintains the following language was improperly omitted from the charge to the jury:

> [t]his provision of the law means that not only is the person who actually commits the criminal act responsible for it but one who is legally accountable as an accomplice is also responsible. Now this responsibility as an accomplice may be equal and the same as he/she who actually committed the crime(s) or there may be responsibility in a different degree depending on the circumstances as you may find them

---

[9]  This language is not part of Model Charge # One.

A-1796-22

to be.  The court will further explain this distinction in a moment.

Further, Defoe argues that the court also improperly omitted the same language as Ellis points out:  "[r]emember that this defendant can be held to be an accomplice with equal responsibility only if you find as a fact that he/she possessed the criminal state of mind that is required to be proved against the person who actually committed the criminal act(s)."

Additionally, Defoe argues that the court incorrectly charged the jury that "[i]n order to find Alterik Ellis and/or Travis DeFoe guilty [under accomplice liability] the State must prove beyond a reasonable doubt," "[t]hat Alterik Ellis and/or Travis Defoe possessed a criminal state of mind that is required to be proved against each other." (emphasis added).  Both Model Jury Charges for accomplice liability, Model Charge # One and Model Charge # Two, require the court to provide the jury the following language:  "[t]hat this defendant possessed the criminal state of mind that is required to be proved against the person who actually committed the criminal act."  Model Charge # One, at 2, Model Charge # Two, at 2.

Here, Defoe argues the foregoing language, requiring the State to prove that he possessed the same mens rea as "the person who actually committed the criminal act," was "critical to [Defoe] who was, at most, the driver of the Camry

31

(based solely on allegedly depicted dropping the car on a street in Newark) and was never discussed as being the shooter." According to Defoe, "[n]o evidence was shown at trial that [he] was ever aware that . . . co-defendant [Ellis] possessed a weapon of any kind, no less intended to shoot wildly into the crowd."

Defoe concedes that "the jury obviously rejected [his] defense that he was not involved" in the shooting death of J.S. However, Defoe contends that his defense "is not a reason to excuse an inadequate charge," citing State v. Cook, 300 N.J. Super. 476, 488 (App. Div. 1996). According to Defoe, "[w]hat remained [after the jury rejected his defense] was the need for a precise assessment of Defoe's level of culpability, dependent on his own mens rea. Without a full jury charge instilling the principles of Bielkiewicz, the jury lacked the tools to make this assessment."

The State, on the other hand, argues that "an accomplice-liability charge was not required because the evidence fails to support a finding that defendant did not share the homicidal state of mind with his co-conspirator[,]" citing Rue, 296 N.J. Super. at 115 (App. Div. 1996).

The State's version of the case was: that defendants conspired together to engage in the murder of the victim, where one party was responsible for driving

the getaway car, and later discarding of it in another municipality to avoid detection, and where the other was to shoot wildly into the crowd gathered outside of 76 Brinkerhoff. The second version offered by Ellis was: that he was simply not involved in the crime at all. "Neither of those versions warranted a Bielkiewicz charge, the former because defendant's culpability was as a principal; the latter because [Ellis] was not guilty of a crime at all," citing ibid.

Ellis now suggests that the jury could have deduced a third scenario which would have compelled a Bielkiewicz instruction: that "while the shooter may have intended death, the accomplice could well have intended merely to menace those outside the apartment building—especially when so many shots missed hitting anyone." The State maintains "[t]he problem with this suggestion is . . . that there is absolutely no evidence whatsoever from which a jury, once having identified [Ellis] as an actual participant" in the murder of J.S., "could differentiate between his culpability and that of the other perpetrator[] of this crime," citing id. at 116. The State argues:

> Rather, the evidence only shows [Ellis's] active participation in the offense: first entering and sitting inside the stolen vehicle for several minutes with Defoe before driving him towards the crime scene, then leaning out of the car's window to fire at least nine shots toward the crowd outside 76 Brinkerhoff, then speeding away from the shooting and going [] home to change his clothes [to] avoid detection.

According to the State, Ellis's "culpability as a principal is further bolstered by the jury's decision to convict him of possessing a gun for an unlawful purpose." The State argues "'[i]n short, on the evidence presented, once having rejected [Ellis's] claim of non-complicity,'" no reasonable jury could have concluded that "[Ellis had] the mens rea of a lesser crime than that of the principal," quoting ibid.

The State avers Defoe:

> now suggests that the jury could have deduced a third scenario [] which would have compelled a Bielkiewicz instruction: that defendant . . . "was, at most, the driver of the Camry" and was not "aware that [Ellis] possessed a weapon of any kind, no less intended to shoot wildly into the crowd."

The State maintains "that there is absolutely no evidence whatsoever from which a jury, once having identified [Defoe] as an actual participant" in the murder of J.S. "could differentiate between his culpability and that of the other perpetrator[] of this crime," citing ibid. The State argues:

> [r]ather, the evidence only shows [Defoe's] active participation in the offense: first entering and sitting inside the stolen vehicle for several minutes with Ellis before driving him towards the crime scene, driving the car while Ellis leaned out of the car's window to fire at least nine shots toward the crowd outside 76 Brinkerhoff, then speeding away from the shooting before dropping Ellis to go . . . home to change his

34

clothes [to] avoid detection while Defoe himself went to dump the car in Newark.

The State adds Defoe's "culpability is further bolstered by the jury's [decision] to convict him of possessing a gun for an unlawful purpose." As with Ellis, the State argues that "'on the evidence presented, once having rejected Defoe's claim of non-complicity,' no reasonable jury could have concluded that Defoe has the mens rea of a lesser crime than the principal," (quoting ibid.).

The State also argues that defendants' claims of innocence were evidence that a Bielkiewicz instruction was not required. While the State recognized claims of innocence do not "eliminate[] the possibility that a faulty accomplice liability charge could have prejudiced them," quoting Cook, 300 N.J. Super. at 488, the State argued that it does reduce the likelihood. According to the State, "[w]here 'a defendant argues that he was not involved in the crime at all,' that claim of innocence helps to show the 'defendant suffered no prejudice' from a failure to instruct the jury on accomplice liability under Bielkiewicz," quoting Maloney, 216 N.J. at 105-06, 109-10. Thus, the State asserts that the "accomplice-liability instruction was not erroneous for omitting the language of Bielkiewicz."

In this case, the court instructed the jury that "[i]n order to find Alterik Ellis and/or Travis DeFoe guilty [under accomplice liability] the State must

prove beyond a reasonable doubt," "[t]hat Alterik Ellis and/or Travis Defoe possessed a criminal state of mind that is required to be proved against each other." However, both Model Jury Charges for accomplice liability—Model Charge # One and Model Charge # Two—require the court to instruct the jury: "[t]hat this defendant possessed the criminal state of mind that is required to be proved against the person who actually committed the criminal act," Model Charge # One, at 2, and Model Charge # Two, at 2.

Here, the court's "repeated use of 'and/or' wrung from the [accomplice liability] charge any clarity it might have otherwise possessed." State v. Gonzalez, 444 N.J. Super. 62, 77 (App. Div. 2016). The use of the "and/or" in the accomplice liability charge allowed the jury to convict Ellis as an accomplice even if only Defoe had the necessary mens rea for any of the charged crimes and vice versa. The instruction did not necessarily require the jury to consider Ellis's mens rea. Moreover, the charge permitted the jury to convict Ellis as an accomplice to murder without requiring the State to prove that he had the required mens rea, or even that he shared Defoe's criminal state of mind. Rather, the jury was permitted to convict Ellis as an accomplice to murder if it simply determined that Defoe possessed the necessary criminal intent.

Furthermore, the charge was confusing for giving yet another inscrutable instruction about the necessary criminal state of mind. The court instructed the jury that the State was required to prove that one or both accused possessed "a criminal state of mind that is required to be proved against each other." (emphasis added). The foregoing language diverges significantly from the language a proper accomplice liability charge requires, specifically: "[t]hat this defendant possessed the criminal state of mind that is required to be proved against the person who actually committed the criminal act." (quoting Model Charge # Two, at 2).

"Clear and correct jury charges are essential for a fair trial, and the failure to provide them may constitute plain error." Gonzalez, 444 N.J. Super. at 76 (citing Maloney, 216 N.J. at 104-05). While neither Ellis nor Defoe objected to the court's accomplice liability instruction, when we view the charge as a whole and considering the State's proofs, which relied largely on circumstantial evidence, we conclude the jury charge was "clearly capable of producing an unjust result." State v Burns, 192 N.J. 312, 341 (2007) (quoting R. 2:10-2). "Contradictory and inconsistent charges are inherently inadequate as they 'create a reasonable likelihood that a juror understood the instructions in an

unconstitutional manner.'"  State v. Moore, 122 N.J. 420, 433 (1991) (quoting

Francis v. Franklin, 471 U.S. 307, 323 n.8 (1985)).

Here, the accomplice liability instructions were inherently ambiguous because the court expressly failed to explain in clear language what the jurors were required to decide and not specifically tailored to the facts of the case. Consequently, the jury could have convicted either defendant without finding that all the elements were proven beyond a reasonable doubt.  See Gonzalez, 444 N.J. Super. at 76.  The court also failed to charge lesser included offenses. Given the evidence in this case, we conclude the inherent ambiguity in the jury instructions was plain error warranting reversal of both defendants' convictions.

### The Conspiracy Charge

In point III of his brief, Defoe claims, for the first time on appeal, that the court committed plain error in its conspiracy instruction.  Ellis argues that "a conspiracy to murder is an agreement only to purposely kill."  "Just as with attempted murder, conspiracy to commit murder requires an intent to kill, not just an attempt (or an agreement, with conspiracy) to seriously injure, resulting in death."  Thus, Defoe contends that although the court followed the Model Jury Charge for general conspiracy under N.J.S.A. 2C:5-2, "the judge did not give strict instructions explaining conspiracy to commit murder, which was what

the jury convicted [him] of at trial." Under the instruction provided, "[t]he jury was allowed to convict of conspiracy to murder if they (wrongly) believed that the two agreed to seriously injury someone and then that person died."

Defoe maintains "the jury was not properly instructed on the law in a fundamental and critical way that robbed the court of any ability to trust that the verdict resulted from the jury's unanimous agreement on the correct elements of the crime," warranting reversal of his convictions and a remand for a new trial.

In point VI of his brief, Ellis similarly argues, for the first time on appeal, that the court committed plain error in its conspiracy instruction as well. Ellis asserts the court erred by instructing the jury on conspiracy to commit murder by "fail[ing] to restrict those conspiracies to agreements to purposely kill," and "instead expanding the definition of the crime too far to include agreements to knowingly kill or to purposely or knowingly seriously injure someone."

According to Ellis, "[c]onspiracy to murder is limited to agreements to purposefully kill, not to do so knowingly or to cause serious bodily injury that happens to result in death." Ellis claims that "the jury instruction on conspiracy to murder allowed the jury to convict for levels of criminal intent that fall well short of what is necessary to convict for conspiracy to murder," consequently

depriving him of his rights to due process and a fair trial and requiring reversal

of his convictions for murder and conspiracy and a remand for a retrial.

These issues were not raised below, and therefore, we review for plain

error under Rule 2:10-2.

Under the Criminal Code:

> A person is guilty of conspiracy with another person or persons to commit a crime if with the purpose of promoting or facilitating its commission he:
>
> (1) Agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or
>
> (2) Agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.
>
> [N.J.S.A. 2C:5-2(a).]

The "major basis of conspiratorial liability [is] the unequivocal evidence

of a firm purpose to commit a crime that is provided by the agreement. . . .

Actual commission of the crime is not a prerequisite to conspirator liability. . . .

It is the agreement that is pivotal." State v. Samuels, 189 N.J. 236, 245-46

(2007) (alteration in original) (internal quotation marks and citations omitted).

"A conspirator can be held responsible for the acts of his or her co-conspirators

even if the acts are not within the scope of the conspiracy, if they are 'reasonably

foreseeable as the necessary or natural consequence of the conspiracy.'" State in the Int. of A.D., 212 N.J. 200, 222 (2012) (quoting State v. Bridges, 133 N.J. 447, 466-67 (1993)); see also N.J.S.A. 2C:5-2.

"Because the conduct and words of co-conspirators [are] generally shrouded in 'silence, furtiveness and secrecy,' the conspiracy may be proven circumstantially." Samuels, 189 N.J. at 246 (quoting State v. Phelps, 96 N.J. 500, 509 (1984)). Circumstantial evidence is to be tested

> by the rules of ordinary reasoning such as govern mankind in the ordinary affairs of life. While certain actions of each of the defendants, when separated from the main circumstances and the rest of the case, may appear innocent, that is not significant and undoubtedly appears in every case of criminal conspiracy.
>
> [Ibid. (quoting State v. Graziani, 60 N.J. Super. 1, 13-14 (App. Div. 1959)).]

"[T]here are no legal rules as to what inferences may be drawn." State v. Powell, 84 N.J. 305, 314 (1980). "The question is one of logic and common sense." Ibid. "When 'each of the interconnected inferences [necessary to support a finding of guilt beyond a reasonable doubt] is reasonable on the evidence as a whole,' judgment of acquittal is not warranted." Samuels, 189 N.J. at 246 (alterations in original) (quoting U.S. v. Brodie, 403 F.3d 123, 158 (3d Cir. 2005)).

A-1796-22

Generally, the veracity of each inference does not need to be established beyond a reasonable doubt; rather, "a jury may draw an inference from a fact whenever it is more probable than not that the inference is true." State v. Brown, 80 N.J. 587, 592 (1979). "Nevertheless, the State's right to the benefit of reasonable inferences should not be used to shift or lighten the burden of proof or become a bootstrap to reduce the State's burden of establishing the essential elements of the offense charged beyond a reasonable doubt." Ibid.

"Although there is 'a great deal of similarity between accomplice and conspirator liability and frequently liability may be found under both theories' the concepts are not identical." Samuels, 189 N.J. at 254 (quoting Cannel, New Jersey Criminal Code Annotated, cmt. to N.J.S.A. 2C:2-6(c) (2006)). "The critical difference is that, as statutorily defined, conspiracy requires proof of an agreement to commit a crime whereas accomplice liability does not." Ibid.

In the matter under review, the court instructed the jury on the elements of conspiracy to commit murder, consistent with the Model Jury Charge. See Model Jury Charges (Criminal), "Conspiracy" (N.J.S.A. 2C:5-2) (rev. Apr. 12, 2021).

"Model [J]ury [C]harges are often helpful to trial judges in performing the important function of charging a jury." State v. Cotto, 471 N.J. Super. 489, 543

42

(App. Div. 2022). "Indeed, a jury charge is presumed to be proper when it tracks the [M]odel [J]ury [C]harge because the process to adopt [M]odel [J]ury [C]harges is 'comprehensive and thorough.'" Ibid. (quoting State v. R.B., 183 N.J. 308, 325 (2005)); see also Mogull v. CB Com. Real Est. Grp., Inc., 162 N.J. 449, 466 (2000) ("It is difficult to find that a charge that follows the Model Charge so closely constitutes plain error."); State v. Whitaker, 402 N.J. Super. 495, 513-14 (App. Div. 2008) (quoting State v. Angoy, 329 N.J. Super. 79, 84 (App. Div. 2000)) (explaining that "[w]hen a jury instruction follows the [M]odel [J]ury [C]harge, although not determinative, 'it is a persuasive argument in favor of the charge as delivered'"), aff'd, 200 N.J. 444 (2009).

Defendants' arguments on appeal improperly conflate the crimes of attempted murder with conspiracy to commit murder. Defendants point out that "improperly failing to confine the crime of attempted murder to purposeful attempts to kill was the cause of reversal and remands" in several cases, including Rhett, and argues that "[t]he result should be no different for a jury instruction on conspiracy to murder that fails to confine the crime to agreements to purposely kill the victim."

However, attempted murder and conspiracy to commit murder are separate and distinct crimes. While both crimes charge a purposeful state of

mind, each crime involves different acts. The criminal attempt statute, N.J.S.A. 2C:5-1(a), provides:

> A person is guilty of an attempt to commit a crime if, acting with the kind of culpability otherwise required for commission of the crime, he:
>
> > (1) [p]urposely engages in conduct which would constitute the crime if the attendant circumstances were as a reasonable person would believe them to be;
> >
> > (2) [w]hen causing a particular result is an element of the crime, does or omits to do anything with the purpose of causing such result without further conduct on his part; or
> >
> > (3) [p]urposely does or omits to do anything which, under the circumstances as a reasonable person would believe them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.

Conversely, the conspiracy statute, N.J.S.A. 2C:5-2(a), provides:

> A person is guilty of conspiracy with another person or persons to commit a crime if with the purpose of promoting or facilitating its commission he:
>
> > (1) [a]grees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

A-1796-22

> (2) [a]grees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

While defendants may be correct that "an attempted murder can only be a purposeful attempt to kill," citing Rhett, 127 N.J. at 7, the same is not true about conspiracy to commit murder and, contrary to their contentions, the cases cited by them do not support that proposition. See State v. Abrams, 256 N.J. Super 390, 401 (App. Div. 1992) ("The mere knowledge, acquiescence, or approval of the substantive offense, without an agreement to cooperate, is not enough to establish one as a participant in a conspiracy. . . . There must be intentional participation in the activity with a goal of furthering the common purpose[.]"); State v. Madden, 61 N.J. 377, 394 (1972) ("The crime of conspiracy requires an actual agreement for the commission of the substantive crime, and unless that agreement in fact existed, each defendant is liable with respect to the substantive offense on the basis of his own conduct[.]"); State v. Fornino, 223 N.J. Super. 531, 536 (App. Div. 1988) (concluding that there was ample evidence of a "plan" sufficient to support a finding of guilt for conspiracy to commit murder).

Unlike the crime of attempted murder, "the essence of conspiracy is the illegal agreement and not the specific crime which is the object of the conspiracy." State v. Soltys, 270 N.J. Super. 182, 186 (App. Div. 1994). See

also State v. Carbone, 10 N.J. 329, 337 (1952) (holding that "[t]he offense depends on the unlawful agreement and not on the act which follows it"); Braverman v. U.S., 317 U.S. 49, 54 (1942) ("[a] conspiracy is not the commission of the crime which it contemplates, and neither violates nor 'arises under' the statute whose violation is its object").  Indeed, the purposeful nature of the offense of conspiracy applies to the agreement itself and not to the underlying offense.  State v. Scherzer, 301 N.J. Super. 363, 401 (App. Div. 1997).

> When the State prosecutes a defendant for conspiracy to commit a first or second degree crime, it need not prove that a defendant committed an overt act in pursuance of the conspiracy.  Therefore, because defendants were convicted of conspiracy to commit first and second degree crimes, the sufficiency of the evidence as to the commission of an overt act is not at issue.  The only question is whether a reasonable jury, viewing the State's evidence in its most favorable light, could find beyond a reasonable doubt that defendants, acting with a purposeful state of mind, agreed to commit, attempted to commit, or aided in the commission of [a crime].
>
> [Ibid. (citations omitted).]

Thus, contrary to defendants' contention, there is no "clear limitation that a conspiracy to murder is only an agreement to purposely kill."  The underlying crime, in this case, murder, does not have to be purposeful for the agreement to

be purposeful.  See State v. Lavary, 152 N.J. Super. 413, 418 (Law Div. 1977) ("A conspiracy is not the commission of the crime which it contemplates, and the conspiracy neither violates nor 'arises under' the statute whose violation is its object."), rev'd on other grounds, 163 N.J. Super. 576 (App. Div. 1978); see also Scherzer, 301 N.J. Super. at 401 ("The only question is whether a reasonable jury, viewing the State's evidence in its most favorable light, could find beyond a reasonable doubt that defendants, acting with a purposeful state of mind, agreed to commit, attempted to commit, or aided in the commission of [the crime].").

In sum, we are satisfied the conspiracy jury charge provided to the jury mirrored the Model Jury Charge and was otherwise appropriate.  Angoy, 329 N.J. Super. at 84.  Furthermore, the charge set forth the law accurately.  Jordan, 147 N.J. at 422.  Accordingly, we find no error, let alone plain error, in the conspiracy jury instruction.

## IV.

We, therefore, reverse defendants' convictions and vacate the judgment and amended judgments of conviction.  Given that holding, we need not address the fingerprint, prosecutorial misconduct, cross-examination of Bellini,

47

cumulative error, and sentencing issues. This matter is remanded for a new trial or further proceedings.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division